UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VIDEOLABS, INC.,
Plaintiff,
v.
LUC VANTALON, et al.,
Defendants.

Case No. 25-cv-11001-NW

**ORDER GRANTING IN PART VIDEOLABS, INC.'S MOTION TO DISMISS COUNTERCLAIMS**

Re: ECF No. 30

This dispute arises out of the development, ownership, and alleged theft of "Turing AI" software and source code. Plaintiff and Counter-Defendant VideoLabs, Inc. moves to dismiss the first, sixth, seventh, and ninth counterclaims asserted by Defendants and Counter-Claimants Paolo Siccardo and Luc Vantalon (collectively "Defendants"). ECF No. 30 ("Mot."); *see* ECF No. 28 at 18–49 ("Countercl.").[1] Having considered the parties' arguments and the relevant legal authority, the Court GRANTS IN PART VideoLabs' motion.[2]

## I. BACKGROUND

### A. Counterclaim Allegations

Defendants are software engineers, technology executives, and founders of Digital Keystone. Countercl. ¶¶ 17–19. VideoLabs is a patent acquisition and licensing company. *Id.* ¶ 20.

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Pursuant to Civil Local Rule 7-1(b), the Court previously found this matter suitable for disposition without oral argument. ECF No. 38.

United States District Court
Northern District of California

**1. Individual Contracts #1 & #2**

On June 23, 2023, VideoLabs and Defendants entered into Consultant Services Agreements (CSAs), which "functioned as a framework agreement for later defined projects." *Id.* ¶¶ 22–23; *see* ECF No. 28-1 (CSAs).

On June 23, 2023, VideoLabs entered into Individual Contract #1 with Defendants. ECF No. 28-1 at 8–9, 20–25; ECF No. 28-2 at 2–3, 8–9. Under Individual Contract #1, Defendants "agree[d] to provide professional services and deliverables by working as directed by the Chief IP Counsel":

> 1.1(a) Patent Analysis and Case Development
>
> 1.1(a)i. Actively participate in reverse engineering and analysis of third-party products and services that relate to various Digital Keystone patents
>
> 1.1(a)ii. Perform reverse engineering, as needed and as directed by the Chief IP Counsel, in support of VL's general patent licensing initiatives;
>
> 1.1(a)iii. Work at the Chief IP Counsel's direction, to support VL's development of high quality and persuasive claim charts, EOU's, and other collateral, as needed; and
>
> 1.1(a)iv. Actively participate in red team sessions to properly vet the quality of VL claim charts and other patent material before VL distributes such material in connection with VideoLabs customer engagements; and
>
> 1.1(b) The Parties may also agree in advance in writing (e.g., by email) that Consultant will provide services in connection with additional projects.

ECF No. 28-1 at 8, 20; ECF No. 28-2 at 2, 8. "Nothing in Individual Contract #1 covered the development of Turing AI, nor did the parties agree in advance in writing that Counterclaimants would provide services to develop Turing AI." Countercl. ¶ 27.

On March 1, 2024, VideoLabs entered into Individual Contract #2 with Defendants.[3] *Id.* ¶ 28; *see* ECF No. 28-2 at 14–15, 17–18. Defendants agreed to provide the following services:

---

[3] Defendants allege that "[o]n March 1, ***2025***, the Parties entered into 'Individual Contract #2' . . ." Countercl. ¶ 28 (emphasis added). This appears to be incorrect. Individual Contract #3 has an effective date of March 1, ***2024***, and the document history shows that Defendants signed the agreement on March 11, ***2024***. ECF No. 28-2 at 14, 16–17, 19.

> 1.1(a) Patent Analysis and Case Development
>
> 1.1(a)i. Actively participate in reverse engineering and analysis of third-party products and services that relate to various Digital Keystone and other VideoLabs' patents;
>
> 1.1(a)ii. Perform reverse engineering, as needed and as directed by the Chief IP Counsel, in support of VL's general patent licensing initiatives;
>
> 1.1(a)iii. Work at the Chief IP Counsel's direction, to support VL's development of high quality and persuasive claim charts, EOU's, and other collateral, as needed;
>
> 1.1(a)iv. Perform patent mining and analysis activities in support of VideoLabs' active acquisitions function, as directed by the VP, Acquisitions and Partnerships, and
>
> 1.1(a)v. Actively participate in red team sessions to properly vet the quality of VL claim charts and other patent material before VL distributes such material in connection with VideoLabs customer engagements; and
>
> 1.1(b) The Parties may also agree in advance in writing (e.g., by email) that Consultant will provide services in connection with additional projects.

ECF No. 28-2 at 14, 17.[4] Individual Contract #2 "did not mention Turing, AI tool development, or any agreement by Counterclaimants to create a new software platform for VideoLabs." Countercl. ¶ 28 (citing ECF No. 28-2).

**2. Development of Turing AI**

In March 2024, Defendants began working on what would become Turing, an artificial intelligence platform that analyzes patents. *Id.* ¶¶ 2, 31. "Vantalon and Siccardo alone created the development repository, defined the product requirements and architecture, planned sprints and milestones, and began writing the software code that became the foundational structure of a new AI system, referred to as Turing." *Id.* ¶ 31. Turing "was developed as a broader AI platform

[4] Defendants allege that "'Individual Contract #2' was largely a repeat of Contract 1, with the added task described as 'actively participate in red team sessions to properly vet the quality of VL claim charts and other patent materials before VL distributes such material in connection with Videolabs Customer engagements.'" Countercl. ¶ 28. But this task is included in Individual Contract #1. ECF No. 28-1 at 8, 20; ECF No. 28-2 at 2, 8. It appears, rather, that Individual Contract #2 added a new requirement that Defendants "[p]erform patent mining and analysis activities in support of VideoLabs' active acquisitions function, as directed by the VP, Acquisitions and Partnerships[.]" ECF No. 28-2 at 17, 20.

capable of multiple applications, one of which was patent analysis for third party customers, in addition to other related functions" and "was designed and built with the general purpose to support multiple customers with customer specific customization data." *Id.* ¶¶ 34–35.

Defendants allege that VideoLabs was not involved in the creation of Turing. "Turing was never conceived as a product for VideoLabs[,]" and "VideoLabs did not write any of Turing's source code, never created or accessed its development repository, never defined the product requirements, never designed its technical architecture, and never created any issue definition or resolution." *Id.* ¶¶ 33, 36. In addition, "[n]o VideoLabs data was used to build Turing, and no training of any large language model using VideoLabs data ever occurred." *Id.* ¶ 37.

Defendants did not show Turing to VideoLabs until October 2024, after they had created the initial Turing prototype. *Id.* ¶ 38; *see id.* ¶ 36. Defendants intended to work with VideoLabs and its Chief IP Counsel Bill Goldman "to monetize and sell [Turing] using VideoLabs' claimed sales expertise." *Id.* ¶ 38.

Goldman arranged for Defendants to present Turing in its first sales demonstration to the Bunsow Law Firm on October 18, 2024. *Id.* ¶ 39. Defendants created the presentation and materials, which were branded as a Digital Keystone product. *Id.* ¶ 40; *see* ECF No. 28-3 (pitch deck). Goldman attended the presentation and introduced Defendants as "VideoLabs business partners," but was otherwise a spectator. Countercl. ¶ 41. "Goldman was fully aware that Turing was branded and presented as a Digital Keystone product, and he did not object or express any disagreement." *Id.* After receiving positive feedback on the presentation, Defendants continued to "buil[d] Turing into a working platform capable of performing substantial patent-analysis functions." *Id.* ¶ 42.

Goldman proposed ideas about how to formalize Turing's development as a joint venture, whereby VideoLabs would handle sales and marketing, and Defendants would handle the technology. *Id.* ¶ 43.

In December 2024, Defendants sent VideoLabs and Goldman a draft letter of intent ("LOI") regarding Turing. *Id.* ¶ 44; *see* ECF No. 28-4 (draft LOI). The draft LOI proposed that each Defendant would receive 25% of revenue, VideoLabs would receive 50% of revenue,

background intellectual property would remain with the respective parties, and the joint venture would own intellectual property developed specifically for Turing. *Id.*; ECF No. 28-4 (draft LOI). In response, Goldman stated that the draft LOI "seems pretty consistent with what we have been discussing" and while they "[w]ill obviously need to let Bill T weigh in on the budget commitments but seems reasonable from my perspective." Countercl. ¶ 45; ECF No. 28-5 at 2.

**3. Individual Contract #3**

On January 1, 2025, VideoLabs and Defendants entered into Individual Contract #3, which renewed the same services as Individual Contract #2. Countercl. ¶ 47; ECF No. 28-2 at 20–22, 24–26.[5] Individual Contract #3 "did not define the original creation of Turing as a separately scoped development project, and it did not state that VideoLabs was purchasing the Turing platform." Countercl. ¶ 47.

**4. Commercialization of Turing**

On January 8, 2025, the parties discussed the allocation of "just VL [VideoLabs] related work" versus "Turing work." *Id.* ¶ 48; ECF No. 28-6 at 2. Siccardo "explained that if Turing work increased, VideoLabs work would decrease." Countercl. ¶ 48; ECF No. 28-6 at 2. "This exchange reflected the parties' shared understanding that Turing work was separate from the ordinary consulting services [Defendants] performed for VideoLabs." Countercl. ¶ 48.

Goldman continued to collaborate with Defendants regarding branding and commercialization for "Turing.IP," including trademark strategy, logos, and website domain names, and a pitch deck for future sales demos. *Id.* ¶¶ 49–50; ECF No. 28-6 at 2–3. In particular, "[o]n January 15, 2025, Goldman requested that VideoLabs be listed in a slide as one of the six a [*sic*] '*preliminary customers*' of the Turing[.]" Countercl. ¶ 51 (emphasis in the original); ECF No. 28-6 at 3.

The final January 16, 2025 pitch deck featured only the Digital Keystone logo on the title page. Countercl. ¶ 52; ECF No. 28-7 at 3–37. The pitch deck also included Defendants'

[5] January 1, 2025 is the effective date of Individual Contract #3, but Vantalon signed that contract on March 26, 2025. ECF No. 28-2 at 20, 23–24. Defendants' exhibits do not indicate when Siccardo signed Individual Contract #3.



United States District Court
Northern District of California

contributions of prior AI developments, their investment of full-time development hours since March 2024, and VideoLabs' "[f]unding of ~20% of work hours." Countercl. ¶ 54; ECF No. 28-7 at 15. VideoLabs and Goldman saw the pitch deck (which stated that Digital Keystone owned Turing) and did not raise any concerns about that representation. Countercl. ¶ 53.

Goldman "arranged for Vantalon and Siccardo to present Turing and the new pitch deck to additional third parties, with Digital Keystone branding." *Id.* ¶ 55. "One of these Goldman-initiated demonstrations resulted in a formal invitation by Ericsson to participate in a tool trial. VideoLabs, as a partner of Ericsson through their NovaCloud joint venture, was required to use outside counsel to negotiate the Ericsson trial agreement at arm's length and to prepare papers for incorporating the joint venture company." *Id.* Thus, on Siccardo's recommendation, VideoLabs retained Digital Keystone's former corporate counsel "to attend to both tasks." *Id.*

**5. Individual Contract #4**

In March 2025, VideoLabs and Defendants executed "Individual Contract #4 (Turing)." *Id.* ¶ 56; ECF No. 28-2 at 27–29 (Vantalon); *id.* at 31–33 (Siccardo). Individual Contract #4 defined the scope of work as follows:

> 1.1(a) Artificial Intelligence ("AI") Tool Development
>
> 1.1(a)i. Development and testing performed in March 2025 as follows:
>
> 1.1(a)i.1. Released full set of primary and secondary multi-model prompts with fusion;
>
> 1.1(a)i.2. Major update released on 3/5 to optimize long chats in the database;
>
> 1.1(a)i.3. Second update on 3/15 to improve multi-model reliability and reasoning model interfaces; and
>
> 1.1(a)i.4. Bug fixes and adjustments as needed.
>
> 1.1(b) The Parties may also agree in advance in writing (e.g., by email) that Consultant will provide services in connection with additional projects.

ECF No. 28-2 at 27, 31. This contract "did not purport to govern the original conception or creation of Turing, which already existed and had already been demonstrated months earlier[,]" did not "convert[] the preexisting Turing platform into a work made for hire, and . . . did not give

United States District Court
Northern District of California

VideoLabs sole ownership of technology Counterclaimants had already conceived and built Countercl. ¶¶ 56–57. Rather, Individual Contract #4 "served as a limited vehicle for VideoLabs to begin fund [*sic*] part of Turing's ongoing development through Vantalon and Siccardo's forthcoming invoices under the agreement." *Id.* ¶ 57.

**6. Proposed Turing Entity**

On August 7, 2025, Goldman emailed Defendants regarding a proposed cap table for a new company to hold Turing that he had discussed with VideoLabs CEO Joe Chernesky. *Id.* ¶ 58; ECF No. 28-8 at 2. Goldman's proposal identified VideoLabs as a 27.9% seed investor; identified Goldman and Defendants as co-founders with equal equity stakes; proposed that VideoLabs contribute $500,000 at 6% interest; kept "DK/VL [Digital Keystone/VideoLabs] on par at the $350,000 investment level," and proposed executive salaries and option grants. *Id.* ¶ 59; ECF No. 28-8 at 2. "Goldman also pushed for immediate incorporation so bank accounts could be opened." Countercl. ¶ 60.

The same day, Goldman texted Defendants that "'Soryn says they are ready to sign as soon as we incorporate newco,' showing he was actively pursuing a third-party deal based on the joint venture structure." *Id.* ¶ 61.

At the time, the parties were also negotiating ownership shares in Turing as part of an anticipated joint venture. *Id.* ¶ 62. "On that same day, Goldman texted that they were ready to sign as soon as the new company was incorporated." *Id.*

On August 8, 2025, Goldman pushed Defendants to accept VideoLabs' proposed cap table, stating in an email: "I am getting ENORMOUS pressure from Joe. He is going to pull the plug very soon. This is really really critical to get a consensus on ASAP ASAP ASAP. I would STRONGLY URGE to resolve on the cap table by tomorrow morning." *Id.* ¶¶ 62, 63; ECF No. 28-9 at 2 (capitalization in the original). "In substance, Goldman threatened that the deal would be terminated unless Counterclaimants promptly agreed to VideoLabs' terms." Countercl. ¶ 63.

No agreement was reached by August 9, 2025. *Id.* ¶ 64. Goldman thus proposed an alternative "'spin-in'" structure, whereby VideoLabs would "'create a subsidiary'" that "would

have 'separate branding' and 'separate emails,' and would 'look unaffiliated with VL.'" *Id.* ¶ 64; ECF No. 28-10 at 2. Goldman's proposal also included "Siccardo and Vantalon assign[ing] the Turing IP to a newly formed subsidiary." Countercl. ¶ 65 (emphasis in the original); ECF No. 28-10 at 2. "By proposing to 'spin' Turing into a newly created subsidiary, Goldman admits that Turing exists outside the VideoLabs corporate structure and would enter it, if at all, only through a new negotiated transaction and assignment of IP." Countercl. ¶ 66. On August 14, 2025, Goldman organized and led an in-person meeting regarding Turing's go-to-market strategy and joint venture economics. *Id.* ¶ 67.

Twelve days later, VideoLabs' outside counsel sent Defendants a cease-and-desist letter asserting that VideoLabs owned 100% of Turing and threatening litigation if Defendants did not agree. *Id.* ¶ 68; ECF No. 28-12. Defendants responded on October 15, 2025. Countercl. ¶ 68; ECF No. 28-13.

By August 2025, Digital Keystone had invested more than 2,600 hours into Turing, representing more than $2 million in development costs. Countercl. ¶ 69. VideoLabs paid $350,217.50 out of $530,217.50 due, leaving $180,000 unpaid. *Id.* ¶ 70. In addition, Defendants incurred $1.5 million in uncompensated development time. *Id.*

### B. Procedural History

On December 26, 2025, VideoLabs sued Defendants, asserting trade secret misappropriation, breach of contract, fraud, and conversion claims arising out of the alleged theft of Turing. ECF No. 1. On March 4, 2026, VideoLabs filed an amended complaint which added a claim for copyright infringement. ECF No. 27.

Defendants answered the amended complaint and asserted ten counterclaims against VideoLabs and Goldman: (1) declaratory relief – ownership of Turing against VideoLabs; (2) declaratory relief – no copyright infringement/co-ownership or superior ownership rights against VideoLabs; (3) declaratory relief – cancellation of copyright registration under 17 U.S.C. § 411(b) against VideoLabs; (4) promissory estoppel against VideoLabs and Goldman; (5) breach of the implied covenant of good faith and fair dealing against VideoLabs; (6) quantum meruit against VideoLabs; (7) unjust enrichment against VideoLabs; (8) conversion against VideoLabs;

United States District Court
Northern District of California

(9) fraud – in the alternative against VideoLabs and Goldman; and (10) breach of contract against VideoLabs. Countercl. ¶¶ 72–160.[6]

## II. LEGAL STANDARD

To survive a motion to dismiss, a counterclaim plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [plaintiff]." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). But the tenet that a court must accept a complaint's allegations as true "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

VideoLabs moves to dismiss the first counterclaim for declaratory relief, sixth counterclaim for quantum meruit, seventh counterclaim for unjust enrichment, and ninth counterclaim for fraud. *See* Mot.

### A. Inconsistent Counterclaims

As a preliminary matter, the Court notes that Defendants plead counterclaims based on inconsistent theories. On one hand, Defendants assert declaratory judgment, quantum meruit, and unjust enrichment counterclaims on grounds that no contract governed the creation and development of Turing. Countercl. ¶ 56 ("[Independent Contract #4] did not purport to govern the original conception or creation of Turing, which already existed and had already been demonstrated months earlier."); *id.* ¶ 57 ("Nothing in the contract converts the preexisting Turing platform into a work made for hire, and it did not give VideoLabs sole ownership of technology Counterclaimants had already conceived and built."); *id.* ¶ 79 ("Counterclaimants seek a judicial declaration that they are the sole and rightful owners of the Turing IP, and that Turing was not made as a work made for hire asset created for VideoLabs under the parties' consulting

---

[6] As of the date of this Order, Goldman has not yet responded to the counterclaims. *See* ECF No. 39 (stipulation extending deadline to respond).

agreements."); *see* ECF No. 32 ("Opp'n") at 8 ("The First Counterclaim For Declaratory Relief Is Well Pled Because No Written Contract Commissioned the Creation of Turing"). On the other hand, Defendants also assert a breach of contract counterclaim. Countercl. ¶ 153 ("VideoLabs and Counterclaimants entered into written contracts, including without limitation the Consultant Services Agreements and Individual Contracts, pursuant to which Counterclaimants agreed to provide consulting and development-related services and VideoLabs agreed to pay for those services."); *id.* ¶ 158 ("VideoLabs breached the parties' contracts by failing to pay the outstanding invoiced amounts for services rendered.").

Pleading inconsistent theories, in and of itself, is not grounds for dismissal, as parties may plead alternative or inconsistent theories. Fed. R. Civ. P. 8(d)(1) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

**B. Declaratory Relief**

Defendants' first counterclaim "seek[s] a judicial declaration that they are the sole and rightful owners of the Turing IP, and that Turing was not made as a work made for hire asset created for VideoLabs under the parties' consulting agreements." Countercl. ¶ 79.

VideoLabs argues that contracts' explicit language contradicts Defendants' allegation that "[t]here is no written contract between Siccardo and Vantalon and Videolabs that covers the creation of Turing or any AI platform." Mot. at 10 (quoting Countercl. ¶ 75; brackets in the original). Defendants contend that Individual Contract #4 did not "commission[] the original creation of Turing" and that determining whether "the original creation of Turing [falls] within the scope of the consulting services" is a factual dispute. Opp'n at 9.

**1. Incorporation by Reference**

The Court first addresses whether it may consider the CSA and Independent Contracts pursuant to the incorporation by reference doctrine.

When assessing the sufficiency of a complaint under Federal Rule of Civil Procedure

12(b)(6), district courts generally cannot consider material outside of the pleadings. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). But this prohibition does not apply to the incorporation by reference doctrine. *Id.*

Incorporation by reference is a "doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. It "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Once incorporated by reference, a district court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

Because Defendants' counterclaims reference and attach the CSAs and Independent Contracts, the Court may consider them in ruling on VideoLabs' motion.[7]

**2. Analysis**

"Where the main issue raised on a motion to dismiss is one of contract interpretation, a court may resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous." *Archie v. Holiday Inn Club Vacations Inc.*, No. 25-CV-08429-SVK, 2025 WL 3443208, at *2 (N.D. Cal. Dec. 1, 2025) (citation modified); *see Microsoft Corp. v. Hon Hai Precision Indus. Co.*, No. 19-CV-01279-LHK, 2019 WL 3859035, at *5 (N.D. Cal. Aug. 16, 2019) ("Unless extrinsic evidence is involved, the interpretation and construction of a written contract present only questions of law, within the province of the court, . . . and is therefore properly reached on a 12(b)(6) motion to dismiss.") (citations omitted). But "[i]f the . . . agreement is ambiguous, then interpretation of the agreement presents a fact issue that cannot be

[7] VideoLabs asserts that Defendants "omitted [Independent Contract #4] from their exhibits" to their counterclaims. Mot. at 10. Defendants did include it. ECF No. 28-2 at 27–29, 31–33.

resolved on a motion to dismiss." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1008–09 (9th Cir. 2014). "Generally, 'language will be deemed ambiguous when it is reasonably susceptible to more than one interpretation.'" *Id.* (quoting 11 Williston on Contracts § 32:2 (4th ed.)).

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636.[8] "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible[.]" Cal. Civ. Code § 1639; *see Taiwan Semiconductor Mfg. Co. Ltd. v. Longhorn IP LLC*, No. 23-CV-04265-PCP, 2024 WL 3012809, at *4 (N.D. Cal. June 14, 2024) ("'Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.'") (quoting *Ticor Title Ins. Co. v. Emps. Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707 (1995). That said, "what the parties intended by an ambiguous contract is a factual determination, . . . and [if] the language leaves doubt as to the parties' intent, the motion to dismiss must be denied." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 879 (N.D. Cal. 2018) (citation modified).

Defendants do not dispute that Independent Contract #4 concerns Turing. ECF No. 28-2 at 27, 31. Defendants nevertheless offer two arguments as to why neither contract assigns the rights to Turing to VideoLabs. Both are meritless.

First, Defendants contend that "[Independent Contract] #4 arose while the parties were attempting to structure Turing as a separate venture." Opp'n at 9; *see* Countercl. ¶ 57 ("[Independent Contract] #4 served as a limited vehicle for VideoLabs to begin fund [*sic*] part of Turing's ongoing development through Vantalon and Siccardo's forthcoming invoices under the agreement.").[9] This is not reflected in Independent Contract #4 or the CSA.

---

[8] California law governs the parties' agreements. ECF No. 28-1 at 6, 18 ("This [Consultant Services] Agreement shall be construed and governed by the laws of the State of California, without giving effect to its conflicts of law principles.").

[9] Paragraph 57 of the counterclaims continues: "Nothing in the contract converts the preexisting Turing platform into a work made for hire, and it did not give VideoLabs sole ownership of technology Counterclaimants had already conceived and built." This assertion is a legal

United States District Court
Northern District of California

VideoLabs and Defendants entered into Independent Contract #4 "pursuant to the Consultant General Services Agreement between the Parties dated June 23, 2023 (the 'Agreement'), the terms and conditions of which apply to and are incorporated by reference into this Individual Contract." ECF No. 28-2 at 27, 31; *see also* ECF No. 28-1 at 2, 14 ("This Agreement constitutes an integral part of each Individual Contract. All Individual Contracts, the Non Disclosure Agreement, and this Agreement shall form a single agreement between the Parties.").

As the parties do not identify any allegedly ambiguous contract language, the Court looks no further than the contract's written terms to ascertain the parties' intent.[10] *See Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1275 (9th Cir. 2023) ("'[W]hen the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.'") (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000)); Cal. Civ. Code § 1639; *Taiwan Semiconductor Mfg. Co. Ltd.*, 2024 WL 3012809, at *4. Section 4.2 of the CSA provides that "no agency, partnership, joint venture, or employee-employer relationship is intended or created by this Agreement or by any Individual Contract." *Id.* at 5, 17. Independent Contract #4 does not disclaim section 4.2 of the CSA, nor does it include language that the contract was part of a greater effort to create a separate joint venture to hold Turing.

Second, the contract language contradicts Defendants' contention that Turing falls outside the scope of Independent Contract #4 because Defendants created Turing on their own and not pursuant to any agreement with VideoLabs. Per the terms of Independent Contract #4, Defendants agreed to develop Turing on behalf of VideoLabs: "VL agrees to engage [Defendants] and [Defendants] agree[] to provide professional services and deliverables . . . including . . . : Artificial

conclusion that the Court may not consider on a Rule 12(b)(6) motion.

[10] For this reason, the Court does not consider Defendants' allegations of "contemporaneous" conduct and communications by Goldman and Chernesky that ostensibly show "that Turing was not VL's existing property but an independent asset to be jointly structured." Opp'n at 10 (citing Countercl. ¶¶ 44–45, 48, 58–66).

Intelligence ('AI') Tool Development" consisting of specific "[d]evelopment and testing performed in March 2025[.]" ECF No. 28-2 at 27, 31.

Section 2.2 of the CSA—which is incorporated into Independent Contract #4—covers developments and improvements:

> Consultant [Siccardo/Vantalon] assigns to VL all of Consultant's right, title, and interest in and to (a) ***any and all inventions***, original works of authorship, ***developments***, concepts, ***improvements***, designs, discoveries, ideas, trademarks, moral rights, or trade secrets that ***Consultant may solely or jointly conceive, develop, reduce to practice, establish, or contribute to that*** (i) compete directly with the business of VL or any of the products or services being developed or offered by VL; or (ii) ***result from tasks undertaken by Consultant on behalf of or for the benefit of VL***; or (iii) results from the use of premises, information or property owned, controlled, leased, or contracted for by VL; and (b) VL's Confidential Information.

ECF No. 28-1 at 3, 15 (emphasis added). Under the plain language, therefore, any developments or improvements to Turing made on January 1, 2025 or later fall within the scope of the CSA and Independent Contract #4.

Accordingly, the Court GRANTS VideoLabs' motion to dismiss Defendants' first counterclaim for declaratory judgment. Because it is not clear that Defendants cannot plead additional facts showing that some development of Turing falls outside the scope of the CSA and Independent Contract #4, the dismissal is WITH LEAVE TO AMEND.

**C. Quantum Meruit**

VideoLabs argues Defendants' quantum meruit counterclaim fails because the claim is covered by a written contract. Mot. at 13–14. Defendants argue the counterclaim may proceed because there was no contract governing their conduct and, in any event, they may plead a quantum meruit claim in the alternative. Opp'n at 12.

"Quantum meruit 'refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.'" *Stanford Health Care v. Blue Cross Blue Shield of N. Carolina, Inc.*, No. 21-CV-04598-BLF, 2022 WL 195847, at *8 (N.D. Cal. Jan. 21, 2022) (quoting *Huskinson & Brown v. Wolf*, 32 Cal.4th 453, 458 (2004) (citation omitted). "A contract need not actually exist, but there

United States District Court
Northern District of California

must be circumstances indicating that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'" *CC Lit Holding, LLC v. Infosys Ltd.*, No. 18-CV-00807-BLF, 2021 WL 5037676, at *5 (N.D. Cal. Oct. 29, 2021) (quoting *Port Med. Wellness, Inc. v. Conn. Gen. Life Ins. Co.*, 24 Cal. App. 5th 153, 180 (2018)).

As an initial matter, while Defendants clearly allege their fraud counterclaim in the alternative, it is not obvious from the face of the counterclaims that Defendants plead quantum meruit in the alternative. *Compare* Countercl. at 40 ("(Quantum Meruit) Against Counter-Defendant VideoLabs") *with id.* at 43 ("(Fraud — In the Alternative) Against Counter-Defendant VideoLabs and Goldman") *and id.* ¶ 143 ("This [fraud] claim is pled in the alternative to the extent it is inconsistent with any other counterclaim."). Further, Defendants "cannot use its opposition brief to amend its complaint." *SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*, No. 18-CV-07611-EDL, 2019 WL 13203776, at *7 (N.D. Cal. Oct. 10, 2019) (citing *Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003)).

In any event, the fact that the quantum meruit claim is inconsistent with Defendants' breach of contract claim is not grounds for dismissal. *See* § III(A), *supra*. "Courts have generally held that a plaintiff is 'entitled to plead [a] quantum meruit claim in the alternative' to a claim for breach of contract." *Halo Unlimited v. Anthem Blue Cross Life & Health Ins. Co.*, No. SA CV20-00399-JAK (KESX), 2024 WL 4404954, at *10 (C.D. Cal. Apr. 18, 2024) (citing *Motivo Eng'g, LLC v. Black Gold Farms*, No. 22-CV-01447-CAS, 2023 WL 5680114, at *9 (C.D. Cal. Aug. 29, 2023)) (brackets in the original); *see All Am. Healthcare Servs., Inc v. Beecan Health CT, LLC*, No. 22-cv-03421-SSS(AGRx), 2023 WL 4676850, at *4 (C.D. Cal. June 23, 2023) ("Plaintiff is also permitted to plead under a theory of quantum meruit, in the alternative case that the 2020 Agreement does not apply to the spring 2022 services it provided to Defendants. Plaintiff's quantum meruit claim does not duplicate nor offend its breach of contract claim."); *Weinstein v. Katapult Grp., Inc.*, No. 21-CV-05175-PJH, 2022 WL 137633, at *4 (N.D. Cal. Jan. 14, 2022) (Denying motion to dismiss quantum meruit claim because "parties are plainly permitted to plead in the alternative. *See* Fed. R. Civ. Pro. 8(d)(2). Plaintiff may not ultimately prevail on both the breach of contract and quantum meruit claims, but at this early stage of litigation, he is permitted

to proceed on both in the alternative.").

As discussed above, it appears that the development of Turing was governed by the CSA and Independent Contract #4. Because the Court grants Defendants leave to amend their first counterclaim for declaratory judgment, and as Defendants do not clearly plead their quantum meruit claim in the alternative, the Court GRANTS VideoLabs' motion to dismiss the quantum meruit claim WITH LEAVE TO AMEND.

**D. Unjust Enrichment**

VideoLabs moves to dismiss Defendants' seventh counterclaim for unjust enrichment on grounds that it is not an independent claim under California law. Mot. at 14. Defendants argue that the Court may construe the counterclaim as a quasi-contract claim. Opp'n at 12–13.

This Court, like many others, generally dismisses unjust enrichment claims because "unjust enrichment is not a cause of action" in California. *See Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, No. 24-CV-03567-NW, 2025 WL 2637507, at *18 (N.D. Cal. Sept. 12, 2025) (quoting *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 870 (2018)). In limited circumstances, however, "the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment." *Isgur v. Meta Platforms, Inc.*, No. 24-CV-06559-WHO, 2026 WL 194640, at *10 (N.D. Cal. Jan. 26, 2026) (citation modified). But "a plaintiff may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time, unless the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid." *Isgur*, 2026 WL 194640, at *10 (quoting *Jacobs v. Sustainability Partners LLC*, No. 20-CV-01981-PJH, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020)).

The Court GRANTS VideoLabs' motion to dismiss the unjust enrichment counterclaim WITH LEAVE TO AMEND for the same reasons as the quantum meruit claim.

**E. Fraud**

VideoLabs argues that Defendants' ninth counterclaim for fraud should be dismissed because Defendants fail to allege a misrepresentation, scienter, and intent to defraud. Mot. at 14–18.

"The 'indispensable elements of a fraud claim [under California law] include a false

representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages.'" *Doe v. Vaidyaji Priyanka*, 814 F. Supp. 3d 1073, 1085 (N.D. Cal. 2026) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)) (brackets in the original); *see* Cal. Civ. Code § 1572.

Any claims that are "grounded in fraud . . . must satisfy the traditional plausibility standard of Rules 8(a) and 12(b)(6), as well as the heightened pleading requirements of Rule 9(b)." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018). The heightened pleading standard set forth in Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Allegations of fraud must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. . . . Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (citation modified).

**1. Misrepresentation**

Defendants identify five alleged misrepresentations by Plaintiff:

> Beginning no later than December 2024 and continuing through August 2025, VideoLabs and Goldman made specific material misrepresentations to Counterclaimants concerning the ownership, commercialization, and future structure of Turing, including without limitation: (a) Goldman's December 2024 statement that Counterclaimants' draft letter of intent proposing a joint venture with preserved background IP ownership was 'pretty consistent with what we have been discussing'; (b) Goldman's January 2025 direction that VideoLabs be listed as a 'preliminary customer' of Turing in an investor pitch deck; (c) Goldman's February 28, 2025 statement that 'the plan is for VL covering 50% of the development'; (d) Goldman's continued participation in branding, trademark strategy, and commercialization discussions for 'Turing.IP' as a separate venture; and (e) Goldman's August 7, 2025 circulation of a detailed cap table and incorporation structure positioning VideoLabs as a 27.9% minority investor with equal founder stakes for Goldman, Siccardo, and Vantalon, accompanied by Goldman's statement that the 'waterfall on exits between the three of us are essentially the same.'

Countercl. ¶ 144 (single quotation marks in the original). Defendants further allege that

> These representations were false. On information and belief, by no later than the time these representations were made, VideoLabs had already formed the intent to claim sole ownership of Turing under the

> Consultant Services Agreements and to deny Counterclaimants any ownership interest in the platform.

*Id.* ¶ 145.

VideoLabs argues that Defendants fail to adequately allege any misrepresentations because, while Defendants identify specific statements, they do not allege facts showing that such statements were false at the time they were made. Mot. at 15–16. Defendants cite paragraph 145 and argue that this "allegation states the falsity of each representation: each promise and endorsement of a joint venture structure was false because VideoLabs never intended to honor it." Opp'n at 16.

"[T]o state a fraud claim, [a plaintiff] must establish a misrepresentation, and . . . must allege that [the defendant] knew the misrepresentation was false at the time it was made." *McWhorter v. Procter & Gamble Co.*, No. 24-CV-00806-AMO, 2025 WL 948061, at *8 (N.D. Cal. Mar. 28, 2025) (citing *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996)). "This may be shown by contemporaneous statements made by the defendant or information available to the defendant." *Tecnogruas v. Int'l Transp. Serv., LLC*, No. 24-CV-05984-AB-PVC, 2025 WL 3049589, at *8 (C.D. Cal. Aug. 18, 2025) (citation omitted) "Mere conclusory allegations of the statement's falseness are insufficient." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 879 (N.D. Cal. 2015) (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).

Paragraph 145 is conclusory, as Defendants fail to allege "'facts from which the court can infer that the alleged misrepresentations were actually false at the time they were made.'" *Edri v. Liberty Mut. Ins. Co.*, No. 25-CV-08157-AH-(SKX), 2025 WL 3248697, at *2 (C.D. Cal. Oct. 23, 2025) (quoting *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1153 (S.D. Cal. 2001)); *see Smith*, 160 F. Supp. 2d at 1153 (rejecting argument that "assume[d] that the alleged breach of contract c[ould] be used as evidence that [defendant] never intended to honor the contract, thereby committing fraud" and concluding that the "pleadings fail[ed] to specify facts from which the Court can infer that the alleged misrepresentations were actually false at the time they were made"). In other words, while Defendants have set forth facts describing the who, what, and where of VideoLabs and Goldman's allegedly false statements, Defendants fail to plead facts that



United States District Court
Northern District of California

give rise to the plausible inference that "VideoLabs had already formed the intent to claim sole ownership of Turing" (Countercl. ¶ 145) at the time the alleged misrepresentations were made. Defendants therefore fail to meet Rule 9(b)'s heightened pleading standard.

Accordingly, VideoLabs' motion to dismiss the fraud claim is GRANTED WITH LEAVE TO AMEND.

**2. Scienter and Intent**

VideoLabs also moves to dismiss the fraud counterclaim on grounds that Defendants fail to allege facts that VideoLabs and Goldman had the requisite knowledge of falsity and intent to defraud. Mot. at 16–17. Defendants argue that the timeline of events, as pleaded, constitutes circumstantial evidence of scienter and intent. Opp'n at 17.

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(a). "'Although allegations of scienter [and intent] need not meet Rule 9(b)'s specificity requirement,' there still must be sufficient factual allegations to state a claim on which relief may be granted." *Rothschild v. The Pacific Cos.*, No. 23-CV-01721-LJC, 2025 WL 1745725, at *5 (N.D. Cal. June 24, 2025) (quoting *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1109 (C.D. Cal. 2015); citing Fed. R. Civ. P. 9(b); brackets in the original). "[T]he Ninth Circuit has expressly stated that '[a]n intent to defraud may be inferred from circumstantial evidence.'" *Twitch Interactive, Inc. v. CreatineOverdose*, No. 21-CV-07006-JST, 2024 WL 420704, at *3 (N.D. Cal. Feb. 5, 2024) (quoting *Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008); brackets in the original). But "actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." *Lee v. Foris DAX, Inc.*, No. 24-CV-06194-WHO, 2025 WL 2578239, at *5 (N.D. Cal. Sept. 5, 2025) (internal quotation marks and citation omitted; ellipses in the original).

Defendants point to the timeline of events as circumstantial evidence of scienter and intent to defraud—on August 7, 2025, Goldman circulated a cap table and told Defendants that VideoLabs was ready to sign; on August 8, 2025, Goldman pressured Defendants to accept the

proposed cap table; on August 9, 2025, Goldman proposed a spin-in structure whereby all parties would assign their respective intellectual property to the subsidiary; on August 14, 2025, Goldman led an in-person meeting regarding the proposed joint venture and ownership thereof; and on August 26, 2025, VideoLabs' counsel sent Defendants a cease-and-desist letter claiming full ownership of Turing. Opp'n at 17–18 (citing Countercl. ¶¶ 58–61, 63–68; ECF Nos. 28-8, 28-9, 28-10, 28-11, 28-12). Defendants contend that "[t]he sequence does not describe a negotiation that collapsed. It describes a representation made while an adverse decision had already been formed." Opp'n at 18.

At this early stage, this is sufficient circumstantial evidence of scienter and intent with respect to the alleged August 2025 misrepresentations. Taking the factual allegations as true and construing them in the light most favorable to Defendants, as the Court must, the twelve days between the August 14, 2025 in-person meeting and the August 26, 2025 cease-and-desist letter leads to the plausible inference of scienter and intent to defraud. *See Panelli v. Target Corp.*, 172 F.4th 1120, 1124 (9th Cir. 2026) ("At the pleadings stage, we accept all factual allegations in the complaint as true and construe them in the light most favorable to the nonmoving party.") (citation omitted).

But as VideoLabs points out, Defendants allege that VideoLabs also made misrepresentations in December 2024, January 2025, and February 2025. Reply at 13; *see* Countercl. ¶ 145. Defendants fail to explain or point to allegations showing how the August 2025 statements and events support a finding of scienter and knowledge as to alleged misrepresentations made six to nine months earlier.

The Court therefore DENIES VideoLabs' motion on grounds that Defendants fail to allege scienter and intent as to the August 2025 alleged misrepresentations, but GRANTS the motion WITH LEAVE TO AMEND with respect to the December 2024, January 2025, and February 2025 alleged misrepresentations.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART VideoLabs' motion and DISMISSES Defendants' first, sixth, seventh, and ninth counterclaims WITH LEAVE TO

AMEND.

As VideoLabs does not challenge the second through fifth, eight, and tenth counterclaims, those counterclaims shall proceed as pleaded. *See* Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."). The Court's grant of leave to amend is therefore limited to the first, sixth, seventh, and ninth counterclaims. Defendants may not otherwise amend their counterclaims or assert new ones.

Defendants shall file their amended counterclaims by August 4, 2026.

**IT IS SO ORDERED.**

Dated: July 21, 2026

Noël Wise
United States District Judge

United States District Court
Northern District of California